Matthew L. Sharp, Esq.
Nevada Bar No. 4746
MATTHEW L. SHARP, LTD.
419 Flint St.
Reno, NV  89501
(775) 324-1500
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CHRISTOPHER CARR, ROXANNE CLAYTON and BRIAN BENNETT, On Behalf of Themselves And All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>INTERNATIONAL GAME TECHNOLOGY, THOMAS J. MATTHEWS, ROBERT A. BITTMAN, RICHARD R. BURT, PATTI S. HART, ROBERT A. MATHEWSON, ROBERT MILLER, FREDERICK B. RENTSCHLER, DAVID E. ROBERSON, IGT PROFIT SHARING COMMITTEE, DAVID JOHNSON, DANIEL R. SICILIANO, and JOHN DOES 1-20,<br><br>Defendants. | Case No.<br><br><br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**
**EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiffs, participants in the IGT Profit Sharing Plan (the "Plan"), covering substantially all employees of International Game Technology and its subsidiaries (collectively, "IGT" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), allege as follows:

///

///

1

**INTRODUCTION**

1.      Plaintiffs bring this action on behalf of the Plan and all Participants and beneficiaries in the Plan to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

2.      From November 1, 2007 through the present (the "Class Period"), the Plan acquired and held shares of IGT common stock ("IGT Stock" or "Company Stock"), which was offered as one of the retirement saving options in the Participant Contribution Component of the Plan.

3.      Defendants, each having certain responsibilities regarding the management and investment of Plan's assets, breached their fiduciary duties to the Plan and Participants by failing to prudently and loyally manage the Plan's investment in Company Stock by, among other things: (i) continuing to offer Company Stock as a retirement saving option; (ii) continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when it was no longer a prudent investment for the Plan.

4.      As a result of Defendants' fiduciary breaches, as alleged herein, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

5.      Because Plaintiffs' claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiffs to sue for plan-wide relief for breach of

2

fiduciary duty, Plaintiffs bring this as a class action on behalf of all Participants of the Plan during the Class Period.  Plaintiffs, in the alternative, also bring this action as Participants seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

6.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

7.     Subject Matter Jurisdiction.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."  28 U.S.C. § 1331.

8.     Personal Jurisdiction.  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9.     Venue.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

///

///

///

## PARTIES

**Plaintiffs**

10.     Plaintiff Christopher Carr is a resident of Harrison County in the State of Mississippi.  He is a former IGT employee and is a participant in the Plan under the law of ERISA.

11.     Plaintiff Roxanne Clayton is a resident of Pottawattamie County in the State of Iowa.  She is a former IGT employee and is a participant in the Plan under the law of ERISA.

12.     Plaintiff Brian Bennett is a resident of Washoe County in the State of Nevada.  He is a former IGT employee and is a participant in the Plan under the law of ERISA.

**Defendants**

    **A.**     **The Company**

13.     Defendant IGT is a Nevada corporation whose principal executive officers are located at 9295 Prototype Drive, Reno, Nevada 89521.  IGT is a global gaming company that specializes in the design, manufacture, and marketing of electronic gaming equipment and network systems, as well as licensing and services, in North America and internationally.  IGT reports the results of its operations in two business segments:  (i) North America, which consists of operations in the U.S. and Canada, comprising 76% of consolidated revenues in fiscal 2008, 77% in 2007, and 79% in 2006; and (ii) International, which encompasses the remainder of operations worldwide, comprising 24% of consolidated revenues in fiscal 2008, 23% in 2007, and 21% in 2006.  In addition, the Company has two revenue streams within each business segment: (i) gaming operations, which generate recurring revenues by providing customers with proprietary gaming equipment and network systems, as well as licensing, services and component parts; and (ii) product sales.  IGT's common stock is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "IGT."

14.     The Company is the Plan Sponsor.  See International Game Technology Profit Sharing Plan Prospectus and Summary Plan Description (the "SPD") at 24.

15.     Pursuant to the SPD, "[t]he Plan is sponsored and administered by International Game Technology, which pays all costs of administering the Plan.  The Company has delegated

responsibility for Plan administration to a committee appointed by the Company (the 'Committee'). The Committee has the power to control and manage the Plan." See SPD at 22 (emphasis in original).

16.     Throughout the Class Period, IGT's responsibilities included, along with its officers, directors and executives, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility. Throughout the Class Period, the Company exercised discretionary authority with respect to management and administration of the Plan or management and disposition of the Plan's assets.

**B.     Board of Directors**

17.     Defendant Thomas J. Matthews ("Matthews") served as IGT's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors during the Class Period. He later resigned as President and CEO but remained as Chairman of the Board. During the Class Period, defendant Matthews was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

18.     Defendant Robert A. Bittman ("Bittman") was, at all relevant times, a Director of the Company. Defendant Bittman served as the Company's Executive Vice President, Product Strategy from 2003 until his retirement from IGT in December 2008. During the Class Period, defendant Bittman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

19.     Defendant Richard R. Burt ("Burt") was, at all relevant times, a Director of the Company.  During the Class Period, defendant Burt was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

20.     Defendant Patti S. Hart ("Hart") was, at all relevant times, a Director of the Company.  During the Class Period, defendant Hart was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

21.     Defendant Robert A. Mathewson ("Mathewson") was, at all relevant times, a Director of the Company.  During the Class Period, defendant Mathewson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

22.     Defendant Robert Miller ("Miller") was, at all relevant times, a Director of the Company.  During the Class Period, defendant Miller was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

23.     Defendant Frederick B. Rentschler ("Rentschler") was, at all relevant times, a Director of the Company.  During the Class Period, defendant Rentschler was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control

with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

24.     Defendant David E. Roberson ("Roberson") was, at all relevant times, a Director of the Company.  During the Class Period, defendant Roberson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

25.     Defendants Matthews, Bittman, Burt, Hart, Mathewson, Miller, Rentschler, and Roberson are herein referred to as the "Director Defendants."

26.     The Director Defendants has the power to appoint the members of the IGT Profit Sharing Committee.  See Plan Document, Article VII, § 7.1 at 56 ("A committee (hereinafter referred to as the 'Committee') shall be appointed by, and shall serve at the pleasure of, the Board").   The Plan Document further states in relevant part:

> The Board shall appoint a member of the Committee as the Committee Chairman.  The number of members comprising the Committee shall be determined by the Board which may from time to time vary the number of members.  A member of the Committee may resign by delivering a written notice of resignation to the Committee Chairman.  The Committee Chairman may resign (such office or from the Committee) by delivering a written notice of resignation to the Board.  The Board may remove any member of the Committee (or provide that the Committee Chairman shall no longer act as such) by delivering written notice thereof to such member.  Vacancies in the membership of the Committee shall be filled promptly by the Committee Chairman, subject to the approval of the Committee in accordance with Section 7.2 and subject to annual review by the Board.  If for any reason there is no Committee Chairman, the board shall promptly appoint a new Committee Chairman.

Plan Document, Article VII, § 7.1 at 56.

C.    **IGT Profit Sharing Committee**

27.    Defendant IGT Profit Sharing Committee (the "Committee").  The Committee is the investment fiduciary of the Plan and is responsible for the appointment, monitoring and removal of investment managers and trustees for the Plan, and the establishment of guidelines for the investment funds offered under the Plan.

28.    The Committee may, in its discretion, terminate any Investment Fund, including the IGT Stock Fund.  See Plan Document, Article III, § 3.8(a) at 38.  The Committee may also "establish any other rules, regulations and procedures regarding the Investment Funds as it deems appropriate in its sole discretion."  See id.

29.    One of the Investment Funds available is the IGT Stock Fund.   Pursuant to the Plan Document:

> Up to 100% of the assets of the Plan may be invested in IGT Stock; the actual amount of the Plan assets that shall be invested in IGT Stock will be the amount selected by the participants to be so invested. Cash dividends, stock dividends and stock splits, if any, received by the Trustee on the IGT Stock held in the IGT Stock Fund shall be credited to the appropriate accounts of the Participants who have invested in the IGT Stock Fund.  Any cash dividends on IGT Stock shall be reinvested as soon as feasible in additional IGT Stock.   The Trustee may maintain a residual amount of cash or cash equivalents in the IGT Stock Fund as appropriate.

See Plan Document, Article III, § 3.8(b)(1) at 39.

30.    Pursuant to the Plan Document, the Committee shall act as the "Fiduciary" with respect to control and management of the Plan for purposes of ERISA on behalf of the Participants and their beneficiaries, shall enforce the Plan in accordance with its terms, shall be charged with the general administration of the Plan, and shall have all powers necessary to accomplish its purposes.   See Plan Document, Article VII, § 7.3(a) at 57.

31.    Defendant David Johnson ("Johnson") was, at all relevant times, Chairman of the Committee.  During the Class Period, defendant Johnson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed

discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

32.     Defendants Johnson and the Committee are herein referred to as the "Committee Defendants."

**D.     Officer Defendant**

33.     Defendant Daniel R. Siciliano ("Siciliano") served as IGT's Interim Principal Financial Officer, Chief Accounting Officer and Treasurer during the Class Period.  During the Class Period, defendant Siciliano was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

34.     Defendants John Does 1-20 ("John Does 1-20") are residents of the United States and are or were fiduciaries of the Plan during the Class Period.  These defendants whose identities are currently unknown to Plaintiffs, may include additional IGT employees.  Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

**CLASS ACTION ALLEGATIONS**

35.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between November 1, 2007 and the present, inclusive (the "Class Period) and whose accounts held Company stock or units in the IGT Stock, but excluding all named defendants and their heirs or successors in interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, such information can be ascertained through appropriate discovery.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether Defendants each owed a fiduciary duty to Plaintiffs and members of  the Class;
>
> (b)     whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and
>
> (c)     whether Defendants violated ERISA.

38.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

40.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of (i) individual adjudications dispositive of the interests of the absentee Class members; and/or (ii) establishing incompatible standards of conduct for Defendants.  Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole, and rendering a class action a superior method of fair and efficient adjudication of this controversy.

41.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

42.     The Plan is "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).  Plan Participants can choose from a total of eleven (11) funds (the IGT Stock Fund is included in the 11 funds) for retirement investments. SPD at 11.

43.     The Plan is legal entities that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

44.     In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant.  Rather, Plaintiffs request relief for the benefit of the Plan and for the benefit of its Participants.

45.     The Plan is "defined contribution plan" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  SPD, at 24.

46.     The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants.  Those purchased investments are then allocated to Participants' individual accounts.

47.     The Plan is sponsored by IGT and consists of two programs: (i) the profit sharing program and (ii) the 401(k) program.

48.     Pursuant to the Company's Form 11-K, dated June 26, 2009 ("2009 Form 11-K"):

IGT may make an annual profit sharing contribution based on operating profits as determined by its Board of Directors. The contribution is allocated to eligible participants' accounts proportionately based on annual eligible compensation.

Our employees are eligible to participate in the profit sharing program after completing 1,000 hours of service in a calendar year and reaching the age of 18. Once eligible, Plan participants must be employed on the last day of the Plan year (December 31) to receive their annual profit sharing allocations. Participation in profit sharing is retroactive to January 1 of the year in which the employee became eligible.

49.     Plan Participants may contribute up to 40% of their pretax annual compensation. The Company's employees may make pre-tax contributions to their accounts upon completion of 30 days of full time employment, or one year of 1,000 hours of part-time employment. A Plan participant may discontinue contributions to the Plan at any time. Plan Participants direct 100% of their contributions, matching contributions and profit sharing contributions to the Plan.

50.     IGT's 401(k) contribution matching program provides for the matching of 100% of an employee's contributions up to $750 as determined by the Committee. Employees are immediately 100% vested in all 401(k) contributions. The Plan also allows for rollover contributions from other qualified retirement plans. If the rollover is from an individual retirement account, all assets in the prior retirement plan must have originated as contributions made under a qualified plan.

51.     The assets of the Plan are held in trust under the IGT Profit Sharing Plan Trust Agreement. The Trustee of the Plan under the Trust Agreement is Fidelity Management Trust Company.

52.     Pursuant to the SPD, the Company's SEC filings are incorporated into the SPD:

The following documents filed by the Company with the SEC are incorporated by reference into the Prospectus/Summary Plan Description:

The Company's Annual report on Form 10-K for its fiscal year ended October 2, 1999.

The Company's Quarterly Reports on Form 10-Q for its fiscal quarters ended January 1, 2000, April, 2000, and July 1, 2000.

The description of the Common Stock contained in the Company's Registration Statement on Form S-3 filed with the SEC on April

> 23, 1991, and any amendment or report filed for the purpose of updating such description.
>
> The Plan's Annual Report on Form 11-K for the Plan Year ended December 31, 1999.
>
> All documents filed by the Company pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this Prospectus (but before the Company filed a post-effective amendment indicating that all securities offered by this Prospectus have been sold or that the Company has de-registered all securities remaining unsold) will be deemed to be incorporated by reference into this Prospectus (and such documents will be a part of this Prospectus) from the date that such documents are filed with the SEC.  These documents generally include the Company's annual, quarterly, and current financial and other reports filed with the SEC.

SPD at 27, 28; SPD at 1 ("In accordance with the Securities Act of 1933, as amended (the 'Securities Act'), the Company has filed a Registration Statement on Form S-8 (the 'Registration Statement') with the Securities and Exchange Commission (the 'SEC') to register participation interests in the Plan and 2,500,000 shares of Company's Common Stock . . .)" (emphasis in original).

### A.     **The Plan Fiduciaries**

53.     Named Fiduciaries.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

54.     De Facto Fiduciaries.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

55.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing the Plan documents, through their conduct, and under ERISA.

56.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

57.     Plaintiffs do not allege that each defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them.  As further set forth below, the claims against each defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

58.     On November 1, 2007, the Company issued a press release and announced its financial results for its fourth fiscal quarter and year ended September 30, 2007:

> Net income for the fiscal year increased to $508.2 million or $1.51 per diluted share compared to $473.6 million or $1.34 per diluted share in the prior year.  Fourth quarter net income totaled $122.6 million or $0.38 per diluted share versus $114.9 million or $0.33 per diluted share in the same quarter last year.  Fiscal year financial highlights:

> Record total revenues of $2.6 billion, up 4%, and related gross profit up 8% from the prior year.

> Record gaming operations installed base of 59,200 machines at the end of the fourth quarter, up 19% over prior year end.

> Record gaming operations revenues of $1.4 billion, up 9%, and related gross profit up 13% from the prior year.

> Record non-machine sales of $384.2 million, up 6% from the prior year.

> Record Adjusted EBITDA totaling $1.1 billion, up 10% from the prior year.

> Record diluted earnings per share of $1.51, up 13% from the prior year.

59.     In this press release, Defendant Matthews stated in relevant part:

> IGT achieved another record year in 2007, led by record revenue and placements of our gaming operations machines.  Non-machine sales also reached record levels as our business model continues to evolve towards a greater focus on software and systems . . . . Adjusted EBITDA reached $1.1 billion, and we generated a record level of cash flow from operations.  All of these accomplishments, coupled with the strength of our balance sheet, allowed IGT to return $1.3 billion to shareholders in the form of stock repurchases and dividends in fiscal 2007.

(Emphasis added).

60.     On that same day, defendants Matthews, Cavanaugh and Siciliano held an earnings conference call with investors (which included Plan participants).  Defendants reiterated the Company's financial results and emphasized the Company's efforts to capitalize on its software business and eventually migrate to a server-based ("SB") gaming platform.

61.     Defendant Cavanaugh stated at this earning conference call:

> Today, we reported results for the fourth quarter and fiscal 2007. We not only realized another record quarter for our game and operations business, but we also posted record results for nonmachine sales and cash flows from operations.  For the year, IGT delivered record results on nearly every financial measure and returned a significant amount of capital to our shareholders.  We generated over 70% of our revenues, operating income, and cash throw [sic] without shipping a single unit.

(Emphasis added).

62.     Defendant Matthews also stated at this earnings conference call:

> Our game operations and our nonmachine product sales contributed nearly 70% of the total revenues in 2007 and we expect that we'll have continued growth from these higher-margin sources in 2008 and beyond.  These reflect our efforts to emphasize our software and service businesses, which deliver value to IGT's customers through higher revenue realization and IGT shareholders through increased financial performance, thus continuing to reduce IGT's reliance on the sale of gaming machines.

> Looking forward, the install base of game machines is expected to enter a new growth phase with numerous casino openings and expansions.  One prominent Wall Street investment bank has projected 114,000 new machines in the United States being added over the next three years.  In addition, they estimate 177,500 additional gaming machines across a large number of international markets.  Our diversity and the depth of our innovative products, combined with the worldwide sales and distribution capacity, will

allow to us compete for significant market share in this coming
expansion of nearly 300,000 games.

(Emphasis added).

63.     Defendant Matthews further stated at this earning conference call that the
Company's server-based gaming initiative was on target for 2009 and that its advanced video
gaming platform ("AVP") was taking off:

> We are committed to delivering industry-leading products and
> service to our global customers.  We will continue to plan on
> spending over a billion dollars during the next five years to
> develop new technology.  And while we consider our R&D efforts
> worthwhile long-term investments, we are especially excited about
> the returns we anticipate in the next few years as our server-based
> technology is rolled out.  At the upcoming G2E, we will be
> showing our newest machines and game themes that reflect the full
> diversity of our product lines worldwide.  Many of the machines
> displayed will feature the AVP platform, which allows for the
> higher quality video and game play experience.  Most of IGT's
> game developments are now shifted to the AVP platform, which
> will allow to us serve as the delivery portal the connection to
> server-based gaming environments.   In addition, new AVP
> versions of video poker and spinning real slots will also be on
> display at G2E to help customers round out their gaming floors in
> preparation for the coming of SB.   During 2007, IGT made
> meaningful progress with our SB efforts and remain on target to
> begin commercializing this product in 2009.
>
> *     *     *
>
> Despite the fact that all of the products that we're selling now
> clearly – are clearly compatible with an SB environment, and I
> think there is a wait-and-see mindset exists that will be clarified for
> most when you start seeing announcements of customer
> commitments.   We anticipate that certainly in this fiscal year that
> we will have more than one customer commitment to SB gaming.
> That it is tech – it is through technology that we can stimulate
> future replacement activity that at G2E you have an opportunity to
> see the interface for 3.0 and I think that people will be very
> impressed.
>
> Because historically, people have measured us by the quality of
> our games.  And people have walked through that show or gone
> into other environments and try to predict what games they think
> would be best and try to determine as a result which vendor might
> be best situated – situated for the coming period.  I am very
> comfortable with the fact that when you come to this show this
> year, you're going to see that we are the clear technology leader.
> You're going to leave that environment thinking that we are best in
> class in terms of being able to develop new technologies.  The
> interface – the user interface is going to come across as a very
> intuitive interface and be much like the interfaces that you're
> familiar with and a whole host of other favorite products that exist

> in other industries, and I think that – that doubt that maybe lingers as to will floors be networked and what kind of applications will be delivered is going to be a debate for only a little bit while longer here.

(Emphasis added).

64.     Defendant Matthews also confirmed at this earnings conference call that they were maintaining earnings-per-share guidance for the next two quarters in the range of $0.35 to $0.40, stating in relevant part that "we believe there is a good likelihood that our EPS will break out of this range in the second half of '08." (emphasis added).

65.     Defendant Matthews responded to analysts' questions by stating that he was highly optimistic about the Company's ability to leverage its current platform to fuel growth in the coming quarters:

> [T]here's going to be a couple things that are – we're – game operations are going to continue to grow within our overall business. (Inaudible) with the year-over-year comparisons up plus 9,600 units over the last year. Also the idea that we believe that we're going to grow those unit counts for the Q2 through 4 of this year as well. So I think that that's one area of growth. I think that you're going to continue to see growth and strength in our non-machine sales. There's still an opportunity for to us sell a lot of convergence in that existing install base. Intellectual property licenses to others is still a big source of relatively high margin dollars. The systems business continues to grow. And so we're going to grow there.
>
> You are going to see growth internationally as we continue to expand our footprint in a number of new markets, especially some of the emerging areas that are exciting in Asia and Latin America and us paying attention to other new markets might exist. You're going to see, I think, an uptick of the new unit demand in that back half of the year. And not just in the back half of '08 but carrying through '09 and into '10 because of what has been that identified expansion in North America, which quite frankly might be modest.

(Emphasis added).

66.     As a result of this information, the Company's Stock price increased.  On November 2, 5 and 6, 2007, the Company's Stock price increased 2.13% to $43.66 per share, 1.6% to $44.36 per share, and 1.56% to $45.05 per share, respectively.

67.     The November 1, 2007 statements above were inaccurate because: (i) Defendants had diverted substantial funds to the development of the Company's SB and AVP gaming platforms, which materially compromised the Company's growth prospects and undermined

17

Defendants' optimistic statements; (ii) IGT was unable to develop and market its SB and AVP gaming platforms within the time frame that Defendants had represented to investors (which included Plan Participants) due to increasingly challenging market conditions and mounting costs; (iii) Defendants' positive representations concerning the Company's shift to non-machine based operations were undermined by a slowdown in the gaming industry, the impact of which Defendants minimized; and (iv) Defendants failed to disclose that, as a result of the foregoing, it was not likely that IGT would achieve or exceed its earnings guidance.

68.     On November 28, 2007, the Company filed a 2007 Annual Report on Form 10-K for the fiscal year ended September 30, 2007 ("2007 Form 10-K") with the SEC.  In Item 7 of the 2007 Form 10-K, the Company represented that it was poised for continued growth and record financial results during fiscal year 2008 as a result of its robust product development and "ability to generate substantial operating cash flows."  The 2007 Form 10-K stated in relevant part:

> In fiscal 2007 we achieved the highest annual revenues in company history at $2.6 billion, largely attributable to growth in our gaming operations installed base reaching a record 59,200 machines in service at September 30, 2007.  We operate in two segments, North America and International, with certain unallocated company-wide income and expenses managed at the corporate level. International operations continue to be a growing contributor with operating income up 44% in fiscal 2007.  See the BUSINESS SEGMENT RESULTS below and Note 18 of our Consolidated Financial Statements for additional segment information and financial results.
>
> We are dedicated to generating financial growth by continuing to focus on the three cornerstones of our success: product development, market development and capital deployment.  We invest more in product development than any of our principal competitors and believe this helps us deliver the broadest gaming product lines across the most markets.  Our current development efforts reflect our forward thinking and will support the near term evolution of the gaming floor. This includes the expansion of our business model beyond machine sales toward a more systems-centric, networked gaming environment.  Our new World Game Platform initiative, started in fiscal 2007, will unify and standardize our development efforts worldwide.  We believe our sb™ applications will be commercially available beginning in 2009 and will further differentiate IGT gaming products by offering operators new ways to engage and interact with players, as well as the ability to market cross-functional products and player conveniences.

We are dependent, in part, on new market opportunities to generate growth. Some of these opportunities may come from political action as governments look to gaming to provide tax revenues in support of public programs and view gaming as a key driver for tourism. We continue to expand our footprint globally, especially in emerging markets in Asia and Latin America. Our ongoing initiatives to enhance growth in new areas of gaming include financing customer construction or expansion. In April 2007 we agreed to provide $80.0 million in development financing and $40.0 million in equipment financing over the next five years to gaming operators in Argentina.

We are able to return value to our shareholders and reinvest in our business because of our ability to generate substantial operating cash flows, the highest ever in fiscal 2007 at $821.5 million. During fiscal 2007 we returned $1.3 billion to our shareholders through dividends and share repurchases. We consider strategic business combinations, investments, and alliances to expand our geographic reach, product lines and customer base. During fiscal 2007, we invested $105.6 million in China LotSynergy Holdings, Ltd. (CLS) for developing opportunities in the China lottery, $31.2 million in electronic table games with Digideal and $21.9 million in VCAT for the Mariposa CRM software. See Notes 2 and 5 of our Consolidated Financial Statements for additional information about these investments.

While domestic replacement sales are expected to remain at historically low levels in the upcoming year, we anticipate benefiting from growth in new or expanding domestic markets beginning in the second half of fiscal 2008. We also anticipate revenues will be driven by our growing gaming operations installed base, network systems sales, and machine sales as casino operators begin to upgrade platforms to capitalize on networked functionality and new features. We also expect to benefit from further gaming expansion outside of North America and new content distribution channels enabled by network systems and table gaming initiatives. We will continue server-based gaming development, working with our competitors and customers to ensure the future is powered by an open network that enables products from multiple suppliers to work together without the need for additional programming or interfaces.

(Emphasis added).

69.     As a result of these statements, the Company's Stock increased 3.2% to $42.89 per share on November 28, 2007 and 1.77% to $43.65 per share on November 29, 2007.

70.     The November 28, 2007 statements were inaccurate for the same reasons as those set forth in ¶ 66.

71.     On January 17, 2008, the Company issued a press release and announced its financial results for its first fiscal quarter of 2008:

> Consolidated revenues and gross profit for the quarter were $645.8 million and $366.5 million, respectively, compared to $642.3 million and $352.0 million in the prior year quarter. Consolidated gross margins for the first quarter came in at 57%, up from 55% in the prior year quarter.  Net income in the first quarter totaled $113.7 million or $0.36 per diluted share, compared to $121.0 million and $0.35 per diluted share in the prior year quarter.
>
>         *       *       *
>
> IGT generated $120.2 million in operating cash flow on net income of $113.7 million in the first quarter, down from $223.5 million and $121.0 million, respectively, in the prior year quarter. Operating cash flow decreased primarily due to additional prepayments to secure long-term licensing rights and timing of payments in working capital. First quarter capital expenditures totaled $62.7 million compared to $103.8 million in the prior year quarter.

(Emphasis added).

72.     In this press release, defendant Matthews touted the Company's financial results and prospects, stating in relevant part:

> During the first quarter, IGT made progress towards achieving our long-term objectives, including demonstrating at the Global Gaming Expo this past November our vision for the right slot floor today and in the future.  Operationally we continued to generate margin improvements and moderate revenue growth despite reduced marketplace demand . . . .

(Emphasis added).

73.     On that same date, defendants Matthews, Cavanaugh and Siciliano held an earnings conference call with investors (which included Plan Participants).  Defendants repeated the Company's financial results and prospects.  Defendant Cavanaugh stated that "[a]s demand recovers due to new and expanded markets opening up, as well as new products and technology being released, IGT should continue to achieve more efficiency in generating earnings and cash flow."  He also assured investors that "IGT will continue to be prudent in its capital deployment as we continue to find ways to grow our game operations business and acquire important technologies and intellectual properties.  You have may [sic] rest assured that we will also continue to be astute purchasers of our shares."

74.     Defendant Matthews also represented that the Company's business was trending as Defendants had expected:

> Obviously, we have been operating in a difficult environment.  It has been the weakest replacement demand that we have seen since

1998.  This is going to continue into Q2, but we expect we will
start seeing improvements to replacement demand in Q3 and Q4,
coinciding with some of our product efforts. This last quarter units
were shipped -- units shipped were down 25%, but nonetheless
product sales revenue were down 1% reflects both the expansion of
pricing and margins on our existing products, largely driven by
AVP, and better geographic mix as we continue to expand our
efforts outside the United States. We continue at these peak
earnings and these margins despite these minimal demand levels
which really reflects well on what we anticipate in terms of being
able to expand that even further when we see an uptick in revenue.

(Emphasis added).

75.     Defendant Matthews also described the Company's three growth drivers,
emphasizing the Company's development and market acceptance of its SB products:

There is [sic] going to be three drivers for expanding revenues
through our fiscal year 2010. It's going to be the new and
expansion capacity that we'll see during that period.  We're going
to have continued momentum in our international operations, and
we'll see the sb commercialization and the subsequent replacement
cycle opportunity that is associated with that.

So let me describe each of those in a little bit more detail.  The new
and expanded market growth will start in Q3. We're going to see
shipments pick up because we're going to have units shipped to the
racetracks in Indiana.  We will have some openings here in Las
Vegas for the locals market.  We're going to see expansions in
Native American casinos in California and Connecticut. And
beyond that period of time, we're going to have major resort
openings in Las Vegas, Atlantic City, outside of the country in
Singapore.  We're going to see the impact from the expanded
compacts in California and Washington. There will be the
continued build-out of the market in Pennsylvania. There's going
to be a new market opened in Kansas.  As a result of all of this, our
estimate is there will be over 100,000 units of new or expansion
units by the end of 2010 created in North America. And the
international market has a potential to either match or surpass
North America for growth.

*       *       *

On sb, we continue to make progress, we – that includes
discussions with almost all of our operator customers, especially
those that are opening a casino within the next few years, while we
expect that sb is going to represent a significant upgrade to casino
floors on a systems side, obviously we're focused on the machine
opportunity for replacement cycle.  And that really begins in Q3
for us, as we introduce the new cabinets and platforms that are
situated for the introduction of – the future introduction of sb by
casino operators.

We're going to see the sb cycle in our minds play out in three
phases.  That first effort from us is going to be a commercial
rollout in new operations where we have existing operators

21

> continuing to stand on the sidelines looking for proof of upside in ROI that make sense.  That second phase will be those existing floors starting to install improved results for themselves, and we anticipate that really is the driver of the replacement cycle.  We think that will start taking place in early 2009 for us. And then the third phase is the wider adoption that leads to a changed business model for all of the operators and really results in that accelerated replacement cycle of which we have all spoken.

> As a result of all of this, IGT will be moving to a more service-software revenue orientation that has an expanded margin associated with that, and really less reliance on product sales at some point in the future.  So our guidance is the result of these drivers is because of the new product introductions, but also some uncertainty surrounding the future market conditions, especially replacement demand, in the second quarter.

(Emphasis added).

76.    Defendant Matthews also confirmed that the Company was keeping its guidance and expected to beat its uppermost guidance in the third and fourth fiscal quarters as a result of "good visibility":

> We think that we'd keep the range in place of $0.35 to $0.40, but we'd probably operate outside of that range over the course of each of the next three quarters, perhaps a little bit to the weak side of that in Q2, because of lack of visibility to new and expanded units, but likely to exceed $0.40 of earnings in both of Q3 and Q4, because of reasonably good visibility to the same.

(Emphasis added).

77.    The January 17, 2008 statements were inaccurate for the same reasons as those set forth in ¶ 66.

78.    On April 17, 2008, the Company issued a press release and announced that it had signed a memorandum of understanding with the CityCenter in Las Vegas, Nevada, "pertaining to installing a server-based network and related IGT sb™ and gaming management system products at the development's resort casino scheduled to open in late 2009."

79.    On that same day, the Company issued a press release and announced poor financial results for its second fiscal quarter of 2008:

> Net income for the quarter was $68.4 million or $0.22 per diluted share versus $128.2 million or $0.38 per diluted share in the same quarter last year. For the six month period ended March 31, 2008, net income was $182.1 million or $0.57 per diluted share compared to $249.2 million or $0.73 per diluted share in the same period last year.

80.    In this same press release, defendant Matthews acknowledge that the challenging market environment continued to have an adverse effect on the Company, but delivered an upbeat message about the Company's development efforts and prospects.  Defendant Matthews stated in relevant part:

> IGT's second quarter results were challenged by the current market environment . . . .  We remain focused on strategic initiatives which will maintain our standing as the leading worldwide provider of innovative gaming products and services.  We continue to prepare for the introduction of the next generation of technological innovations and look forward to the market-driven expansion in domestic and international jurisdictions we believe will develop in the near future.  Recent strategic accomplishments that will enhance IGT's long-term opportunities include our sb™-related agreements with Harrah's and CityCenter, our crosslicensing agreement with WMS, our strategic alliances with Progressive Gaming, Games Media and The Global Draw, and our potential acquisition of Cyberview Technology, Inc.

81.    On this same date, defendants Matthews, Cavanaugh and Siciliano held a conference call with investors (which included Plan Participants).  Defendant Cavanaugh emphasized "replacement demand" associated with the AVP platform and other new products and represented that the Company was on track for the second half of the year:

> For the second half of the year, we anticipate replacement demand to begin to pick up as we release our latest products, including six new cabinet designs utilizing the AVP platform. New unit demand should also reaccelerate in the second half of 2008 due to scheduled openings of new and expansion products.

(Emphasis added).

82.    Defendant Cavanaugh also stated the Company's prudent approach to capital deployment, but did not disclose that the Company's tremendous development costs, incurred in the context of the most challenging market the Company had ever faced, were anything but prudent:

> We have 27.4 million shares remaining under the stock repurchase authorization and we continue to expect this authorization to be exhausted by the end of March 2010.  Through the first six months of the year IGT has deployed back to shareholders at total of $333 million through share buybacks and dividends.  IGT will continue to be prudent in its capital deployment as we continue to find ways to grow our game operations business and acquire important technologies and intellectual property.

(Emphasis added).

23

83.     Defendant Matthews also stated that the Company was experiencing difficulties replacing machines with a view toward rolling out its SB and AVP platforms, but nonetheless reaffirmed the timeline associated the rollout:

> We had new products that began shipping in the third quarter and our anticipated new cabinets have delayed some of our customer orders with them expecting to take part in our latest offering.  Of course we continue to concentrate on introducing new game themes particularly for the AVP, that is a real core strength here at IGT.  We made several deals during the quarter which move us further along the path of successful deployment of server-based gaming.
>
> This morning we announced the deal for CityCenter.  We also previously announced the orders that we have for NexGen with Harrah's, the strategic partnership established with WMS and that with BGIC as well.  We also announced this morning through our Barcrest subsidiary a partnership with the global draw and games media in the U.K. and then we have the pending potential transaction of Cyberview.  All of these should help us with our SB efforts as we continue to make progress on the timelines that we previously announced.
>
> To remind people of those timelines '07 was really the introduction of the concept to the marketplace, regulatory agencies and customers.  '08 really has been the effort to prove the concept to ourselves technologically, to the marketplace in terms of impact on the customer.  We expect to have a field trial of SB 3.0 later this quarter and continue to feel comfortable that our timelines for having meaningful impact on '09 in terms of being able to prove the concept and starting to get floor share for it will impact 2010 and beyond as previously articulated.
>
> Our efforts continue to focus on driving this technological innovation forward and we want to provide the best content and applications available for gaming floor and for casino operations.  On our capital deployment and strategy aspects of our business, we continue to invest in our business, first, with capital expenditures.  That's still where we'd rather deploy our money is in continuing to expand our game operations and devising new technology.

(Emphasis added).

84.     Defendant Matthews also stated that "[m]arket expansion continues really in a very robust way even though there has [sic] been a couple of setbacks," and confirmed the Company's financial guidance, which he claimed the Company may actually exceed:

> In the way of guidance, we continue to expect an uptick in our business levels during the second half of the year as new and expansion opportunities open and we release our new cabinets and game titles.  However, given current operating conditions we maintain our guidance at $0.35 to $0.40 for the next four quarters

> with the possibility of coming in at the high end, if not slightly
> exceeding this range in the second half of this year.

(Emphasis added).

85.    Defendant Matthews reiterated the Company's optimistic outlook and stated that he felt "very comfortable" with the Company's position in the marketplace as well as with its prospects, adding that "our backlog is up a great deal quarter-over-quarter."   Defendant Matthews also stated that "there is still an opportunity for us to exceed the range in one or both of the quarters in the back half of '08.  Just because we do have such good visibility to machine demand."

86.    In addition, defendant Matthews denied that the decline in the Company's Stock price reflected the poor quality of its prospects, stating that "the day-to-day changes in the overall valuation of the Company don't always make sense in terms of really reflecting what is, I think, people that are close to our efforts, the underlying strategies."   Pursuant to Matthews, Defendants had a superior grasp of the Company's condition and prospects: "we can be on a call and remark on visibility to a much improved environment for the back half of '08 and reasons to share optimism about '09 and really know that SB will delivered [sic] and impacting our 2010."

87.    Although the Company's announcement pertaining to possible SB business for the CityCenter appears to have been timed to coincide with, and lessen the impact of, the Company's disclosure of its poor second quarter financial results, the CityCenter announcement did not have its intended effect.  Instead, the market's response was overwhelmingly negative, with the Company's stock price declining more than 6% on April 17, 2008 to $35.70 per share on extremely heavy volume of nearly 15 million shares trading.

88.    The April 17, 2008 statements were inaccurate for the same reasons as those set forth in ¶ 66.

89.    On July 17, 2008, the Company issued a press release and announced its financial results for the third fiscal quarter of 2008.  The Company's financial results reflected a huge departure from the same quarter the previous year:

> Net income for the quarter was $108.3 million or $0.35 per diluted
> share versus $136.4 million or $0.41 per diluted share in the same
> quarter last year. For the nine month period ended June 30, 2008,
> net income was $290.5 million or $0.92 per diluted share

compared to $385.6 million or $1.14 per diluted share in the same period last year.

* * *

For the nine-month period ended June 30, 2008, IGT generated $360.7 million in cash from operations on net income of $290.5 million compared to $564.9 million on net income of $385.6 million in the prior year period. Lower year-over-year cash from operations was primarily the result of lower net income, changes in working capital and additional prepayments to secure long-term licensing rights.

Working capital increased to $779.0 million at June 30, 2008 compared to $595.5 million at September 30, 2007. Cash equivalents and short-term investments (inclusive of restricted amounts) totaled $382.1 million at June 30, 2008 versus $400.7 million at September 30, 2007. Debt totaled $2.0 billion at June 30, 2008 compared to $1.5 billion at September 30, 2007. The available capacity on our $2.5 billion line of credit totaled $1.4 billion as of June 30, 2008.

(Emphasis added).

90.     Defendant Matthews claimed that the Company's server-based initiatives would allow it to weather the market environment:

Although the market environment continues to be impacted by unfavorable economic conditions, IGT delivered strong revenues and gross profits during the third quarter . . . . We furthered our server-based gaming initiatives with the release of several new models on our Advanced Video Platform (AVP®) and the completion of the strategic acquisition of Million-2-1 in the third quarter, as well as closing the acquisition of substantially all of the assets of Cyberview Technology, Inc. in July. In addition, we have repurchased 14.6 million shares of IGT stock since April 18, 2008.

(Emphasis added).

91.     On that same day, Defendants held a conference call with investors (which included Plan Participants). Defendant Cavanaugh attributed lower replacement demand to "an internal decision based on manufacturing capacity, and a prioritization of new or expansion units being put in the queue ahead of replacements," stating that "we hope that in Q4 we would see an up tick in replacement demand."

92.     Defendant Matthews also stated the importance of the Company's SB gaming initiative, but was forced to acknowledge that rising development and other costs required the Company to reduce spending in other areas. Defendant Matthews indicated that the Company had finally reduced its earnings guidance:

So that brings us to the topic of guidance, and the fact is that the conditions that we see in the marketplace are looking like they will continue for the foreseeable future. They are unprecedented. We have never really seen gaming play levels fall across all markets as we have in the first half of this year. If that continues, that will probably weigh a little bit on our game ops business, and is probably also going to affect some amount of casino spend activity, whether it relates to CapEx or OpEx. So we at least need to be making sure that we are paying attention to whether or not there is any change of behavior in that regard. And so while we were able to return to our prior trend levels after that difficult second quarter that we reported, we really don't expect we will immediately build upon these results until the market conditions improve.

So the result, I think our guidance for the next three quarters needs to be in a range of $0.30 to $0.35. This range is not going to contemplate any efficiency measures we are able to implement over the period, and it is likely that we will revisit our guidance on future earnings calls if visibility of the future marketplace conditions improves. And as I said, in the back half of 2009, we know that new expansion unit demand should make those results the kind of results that we can have maybe a slight improvement in the guidance that we are giving here.

(Emphasis added).

93.     In addition, defendant Matthews acknowledged that the sheer length of time in developing and rolling out the Company's SB products weighed on the Company and stated that "[T]he problem with the SB story, and I think probably some of the frustration with investors is that we have just been talking about it too long. We've been talking about it now since April of 2005, and it is still November 2009 before you see this big meaningful first deployment . . . ."

94.     The July 17, 2008 statements were inaccurate for the same reasons as those set forth in ¶ 66.

95.     By September 2008, the Company's façade was becoming more prominent as the media began reporting that the Company was undergoing a management shakeup and rumors surfaced that it had to reduce its workforce to staunch rising costs as a result of development efforts.

96.     On September 7, 2008, the Las Vegas Review-Journal published an article entitled INSIDE GAMING: Signs of trouble from slot giant, reporting on the Company's problems and impending layoffs at the Company, which the Company "vigorously denied":

Twelve months ago, Wall Street analysts never imagined having concerns about International Game Technology. The Reno-based company, which has a large corporate presence in Las Vegas, controls the lion's share of the worldwide slot machine market.

IGT has been an analysts' darling among manufacturers. Its stock price was stable and reviewers heaped praise over its products. Despite a casino industry slowdown in the slot machine replacement market, IGT still reported profits. Analysts remained bullish.

What a difference a year makes.

Last week's resignation by IGT Chief Operating Officer Steve Morro may have signaled the start of a companywide shake-up. Gaming sources told of layoff rumors, which IGT spokesman Ed Rogich vigorously denied.

IGT CEO TJ Matthews has said the company is in a restructuring mode.

Rogich said all areas will be looked at to reduce expenses. Matthews, considered one of the industry's brightest executives, is feeling some heat. He will add Morro's COO duties when the resignation is complete. But Matthews is also chairman and president as well as CEO, leaving some analysts worried that management is spread too thin.

Wall Street expressed concern last week that Morro's exit was symptomatic of IGT's fortunes. The stock price is down almost 60 percent from a 52-week high of $49.41 on Feb. 26.

"IGT's fundamentals, market share position, new device platform, game theme and system development progress are not likely to improve in the near term, and may have worsened since the company last communicated with investors," Merrill Lynch gaming analyst Rachael Rothman wrote.

UBS Securities analyst Robin Farley didn't think IGT's strategic examination would help increase earnings until the second half of 2009.

"This review will ultimately include a cost-cutting component," Farley said, adding that the current focus is on management structure.

(Emphasis added).

97.   On September 17, 2008, the Las Vegas Review-Journal published an article entitled IGT to impose layoffs, confirming that IGT was implementing layoffs and that defendant Matthews had informed the workforce via an internal e-mail:

Slot machine giant International Game Technology said Tuesday it will layoff a yet-to-be determined number of employees by Jan. 5 due to the troubled economy.

In an e-mail to employees, IGT Chairman and Chief Executive Officer TJ Matthews said the number of layoffs will be based on

how many workers accept a voluntary separation program that was introduced last week. IGT spokesman Ed Rogich said roughly 500 employees, age 55 and over, were offered buyouts.

\*       \*       \*

Macquarie Capital gaming analyst Joel Simkins said he was not surprised by news of the impending layoffs.  He said the slot machine maker has about 1,200 workers in engineering, an area he said could be reduced.

IGT has also spent millions on server-based gaming, which may not be introduced to casinos as quickly as hoped.  IGT spent $76 million in June to acquire a European slot machine rival as part of its server-based gaming efforts.

"The company needs to get leaner," Simkins said. "There are a lot of incremental expenses that can be cut."

Matthews told IGT workers the company was not closing its Reno headquarters nor are the layoffs focused in one department.  A decision regarding the layoffs is expected to be made by November with the jobs being eliminated in January.

"My hope is that through these efforts, we can stabilize our spending to be aligned with our revenue forecasts and be in a position to weather the near-term uncertainty that is prevalent in our industry and our economy in general," Matthews said.

98.      On that same day, Macquarie Research, an analyst firm that follows IGT, issued a report entitled Changes on IGT Island, lowering TP and estimates, in which it lowered its target price for the Company's stock and highlighted concerns raised by the Company's delayed cost saving measures, including the impending downsizing efforts reported by the Las Vegas Review-Journal. Specifically, Macquarie expressed concern that the Company's efforts to revise its cost structure came far too late:

While we are pleased that IGT is starting to take the right steps to right size its cost structure in light of the current environment, it may not be enough to offset a top line slow down.  We have reduced estimates as detailed further in our note, largely trimming expectations for participation game placements and revenue, as well as domestic/international game sales.

\*       \*       \*

While IGT has been pounded YTD, down 57% versus 17/16% declines in the S&P 500 and Russell 3000, we recommend that investors continue to hold off buying the shares.  Although IGT appears to be focusing on developing more innovative content to offset market share losses, rather than an all out effort to force migration to server-based, we are concerned that it could be on the verge of permanent displacement of share to its key rivals.

(Emphasis added).

29

99.   Macquarie also characterized the planned layoffs as one of several "drastic measures to align the cost structure (500 employees to be involuntarily reduced with potential restructurings to follow)."

100.   On this news, the price of IGT's Stock price dropped 6% to $17.70 per share.

101.   On October 30, 2008, the Company issued a press release and reported disappointing financial results for the fourth fiscal quarter that came in well below earnings guidance, and announced its financial results for the fiscal year ended September 30, 2008:

> Net income for the quarter was $52.1 million or $0.18 per diluted share, inclusive of a non-cash charge of $28.6 million or $0.10 per diluted share from write-downs of certain investments, versus $122.6 million or $0.38 per diluted share in the same quarter last year.   For the fiscal year, net income was $342.5 million or $1.10 per diluted share compared to $508.2 million or $1.51 per diluted share in the same period last year.

> \*      \*      \*

> For the fiscal year ended September 30, 2008, IGT generated $516.3 million in cash from operations on net income of $342.5 million compared to $821.5 million on net income of $508.2 million in the prior year period.  Reductions in year-over year cash from operations were primarily the result of lower earnings, increased inventory, additional prepayments to secure long-term licensing rights and increases in accounts receivable.

(Emphasis added).

102.   Defendant Matthews downplayed the Company's business problems and instead emphasized its prospects in developing new product technologies:

> Our fiscal 2008 results reflect challenging economic operating conditions affecting our customers and in turn our business . . . . Despite these challenges, we remained focused on key business initiatives. During 2008, IGT released several new models on our Advanced Video Platform (AVP®) and released close to 700 game titles worldwide across all platforms.  We made significant progress in the development of our server-based gaming initiatives and will begin commercially deploying initial versions of this technology in 2009.

103.   On that same day, defendants Matthews and Cavanaugh held a conference call with investors (which included Plan Participants). Defendant Matthews stated that the Company was "going to make strategic changes to increase productivity and responsiveness to the customer and this marketplace needs [sic]."   As part of these strategic changes, defendant Matthews indicated that the Company sought to "adjust headcount," targeting "initial cost

savings of about $20 million to $25 million per quarter" with "the impact to begin in the second

quarter of 2009."   He also indicated that Defendants expected that earnings per share "will

probably come in at the lower end or maybe even slightly below our previous guidance of $0.30

to $0.35."

104.    Defendant Matthews was finally forced to admit that the Company was simply

not positioned for revenue growth with its increasing operating and developmental expenses:

> [J]ust on expense reduction, that we wanted to make sure that we
> did it right, that we've spent about $700 million in operating
> expenses in the course of 2007, got ourselves to a run rate of $800
> million or so by the end of this fiscal year 2008, and it was too
> much.  Obviously it was done in anticipation of revenue growth
> that has been deferred, and so we need to reinvestigate costs.
> Much of that cost reduction is a reduction in staffing, and we
> wanted to make sure that we did it really with the idea that it was
> gentle as possible with our employees, that much of this situation
> is management created, and not necessarily the result of not every
> individual at IGT working very hard, and so offering first an early
> retirement program, and then following that with kind of the
> involuntary separations, was our plan.  All of that is going to be
> accomplished by the middle of November, and that will manifest
> itself in much of the cost reduction. But the cost review doesn't
> stop there.
>
> I mean, really, we are looking at every expense and refocusing IGT
> on the idea that expenses matter. So it's cost of goods, it's SG&A,
> it's R&D, it's other expenses, it's taxes.  Five big categories for us
> to have focus on, making sure that whether it's access to capital, or
> it's better planning from a tax perspective.  It's making sure that
> our R&D priorities are correct, that the SG&A staffing supports
> the current level of business, that our cost of goods demonstrates
> efficiencies wherever possible. All of that is being focused.   And
> so I really expect that we will exceed that run rate as the course of
> the year progresses, and that $175 million a quarter or less still is
> the goal in total operating expenses. And so it may seem like it's
> taking a little while, but maybe it just took us a little while to say
> that we were committed to it, which we did last call, and I think
> got on it pretty quickly here with kind of this final action in
> November.

(Emphasis added).

105.    In addition, defendant Matthews stated that the development and rollout of the

Company's server-based platform would take a backseat to gaming content, in light of demand

in the marketplace:

> Steve Wieczynski:  Yes, one more question for you guys. T.J., will
> you just give your strategy heading into G2E this year?  I mean,
> last year you were clearly focused on your SB platform. Will that

change materially going into this year?  Are you going to be focused more on the content?

<u>Matthews</u>:  Well, I think it's – it's too bad that content ever seems to take a back seat, because this company is built around games. It's focus is games, and every show I think has that at its core, but because of the idea of how games are going to be delivered and how the customer experience is going to be expanded due to network implementation, that that seems to kind of be in the background now.  This show where we've launched AVP, and we launched MLD, you will see a much greater impact from our game development than maybe you noticed in recent shows.  SB being deployed on a smaller footprint in the casino environment is all about how to help the performance of 25 to 100 games through expanded offering on the game side of the equation.  And so even the SB offering, the strategy, will have a much greater games focus than it has in times past. So I think content will be the star of the show this year.

(Emphasis added).

106.    As a result of these statements, the Company' Stock dropped nearly 5% to $12.01 per share.

107.    In November 2008, the Company implemented its workforce reduction, which the press reported on November 14, 2008.  The layoffs eliminated roughly 10% of the Company's workforce and had an equally profound effect on the Company's Stock price, sparking a decline that drove the stock down to $7.58 per share on November 20, 2008.

108.    During the Class Period, Defendants misled the investing public (which included Plan Participants), thereby inflating the price of IGT Stock, by publicly issuing inaccurate statements.

## **THE LAW UNDER ERISA**

109.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

110.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through

use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

111.   ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

112.   These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

(a)   the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in IGT Stock, to ensure that each investment is a suitable option for the Plan;

(b)   the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)   a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

113.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or

omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

114.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

115.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

116.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

117.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock.   Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and the plan-related documents which incorporated and/or reiterated these statements.  Defendants also acted as fiduciaries to the extent of this activity.

118.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

**CAUSES OF ACTION**

**COUNT I**

119.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

120.    At all relevant times, as alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

121.    As alleged above, Defendants were all responsible, in different ways and to differing extents, for management of the Plan or disposition of the assets of the Plan and were, during the Class Period, responsible for ensuring that the Plan's investment options, including the IGT Stock Fund, made available to participants in the Plan, were prudent.

122.    Furthermore, under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Thus, Defendants were responsible for ensuring that investment in IGT Stock under the Plan was prudent, and are liable for losses incurred as a result of such investments being imprudent.

123.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or would harm plan participants or beneficiaries, nor allow others, including those whom they direct or are directed by the plan, including plan trustees, to do so.

124.    Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

125.    According to the DOL regulations and case law interpreting ERISA § 404, a fiduciary's investment or investment-related course of action is prudent if:  (a) s/he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or course of action involved, including the role the investment or course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) s/he has acted accordingly.

126.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

• A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

• Consideration of the following factors as they relate to such  portion of the portfolio:

o The composition of the portfolio with regard to diversification;

o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

o The projected return of the portfolio relative to the funding objectives of the plan.

127.    Given the conduct of the Company, as described above, Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in IGT Stock because, among other reasons:

• (i) Defendants had diverted substantial funds to the development of the Company's SB and AVP gaming platforms, which materially compromised the Company's growth prospects and undermined Defendants' optimistic statements; (ii)

IGT was unable to develop and market its SB and AVP gaming platforms within the time frame that Defendants had represented to investors (which included Plan Participants) due to increasingly challenging market conditions and mounting costs; (iii) Defendants' positive representations concerning the Company's shift to non-machine based operations were undermined by a slowdown in the gaming industry, the impact of which Defendants minimized; and (iv) Defendants failed to disclose that, as a result of the foregoing, it was not likely that IGT would achieve or exceed its earnings guidance;

- The risk associated with the investment in IGT Stock during the Class Period was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's Participants, and Defendants were aware or should have been aware that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it; and

- Knowing of this extraordinary risk, and knowing the Participants were not aware of it, Defendants had a duty to avoid permitting the Plan or any participant from investing Plan's assets in IGT Stock.

128.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that IGT Stock was not a suitable and appropriate investment for the Plan as described herein. Nonetheless, during the Class Period, Defendants continued to invest the Plan assets in IGT Stock, instead of other, more suitable, investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in IGT Stock

129.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, were damaged.

130.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants named in this count, are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

131.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

132.     As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

133.     As alleged above, the scope of the fiduciary responsibilities of all Defendants, to differing extents, included disseminating plan documents and/or plan-related information to participants regarding the Plan and/or assets of the Plan.

134.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan.

135.     This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate information regarding the prudence of maintaining investment in the Plan, so that Participants can make informed decisions with regard to their investment options available under the Plan.

136.     This fiduciary duty to honestly communicate with Participants is designed not merely to inform Participants and beneficiaries of conduct, including potentially illegal conduct, bearing on their retirement savings, but also to forestall such misconduct in the first instance.  By

failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

137.     Defendants breached their fiduciary duties by failing to provide the Plan's participants with complete and accurate information, and the consequent artificial inflation of the value of IGT Stock, and, generally, by conveying inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in the Company Stock.

138.     Had Defendants not constantly reinforced the safety, stability and prudence of investment in IGT Stock during the Class Period, the Plan's Participants, to the extent permitted, could have divested their holdings of Company Stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses.

139.     Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the IGT Stock, despite knowledge of their breaches.  Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to the Plan Participants, yet not making any effort to remedy the breaches.

140.     Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investing the Plan's assets in IGT Stock, and were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in the IGT Stock Fund during the Class Period. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants named in this Count.

141.     Plaintiffs further contend that the Plan suffered a loss, and Plaintiffs and the other Class members suffered losses, by the above-described conduct of Defendants during the Class Period because that conduct fundamentally deceived Plaintiffs and the other Class members about the prudence of making and maintaining retirement investments in IGT Stock, and that, in making and maintaining investments in IGT Stock, Plaintiffs and the other Class members relied to their detriment upon Defendants' inaccurate statements, acts and omissions.

142.     As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Plan's Participants, lost a significant portion of their retirement savings.

143.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

144.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

145.     This Count alleges fiduciary breach against the following Defendants: IGT and the Director Defendants (the "Monitoring Defendants").

146.     As alleged above, during the Class Period, the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

147.     As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and monitor the performance of other Plan fiduciaries, including the Committee Defendants.

148.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

149.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

150.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

151.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's true financial condition and the consequent threat to Company's earnings, which made IGT Stock an imprudent retirement investment; and/or (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their plan accounts.

152.    In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of IGT.  The Monitoring Defendants knew or should have known that the monitored fiduciaries needed to make informed fiduciary investment decisions in view of the Company's financial condition, which most, if not all, Monitoring Defendants had

direct knowledge of, if not complicity in.  By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

153.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, they enabled the breaches by these defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

154.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

155.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

156.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

158.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

159.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

///

///

(a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in IGT Stock, to ensure that each investment is a suitable option for the Plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan's sponsor; and

(c)     A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

160.     Upon information and belief, the Plan's administrators received IGT Stock pursuant to incentive and nonqualified stock options and restricted share awards.

161.     Thus, Defendants had a significant personal financial incentive to maintain a high price for IGT Stock.

162.     Defendants had an incentive not to disclose the Company's true financial condition to the Plan's Participants in hopes that such Participants would select IGT Stock for their retirement accounts and, therefore, help maintain a high price for IGT Stock.

163.     Defendants also had an incentive to maintain IGT Stock as an investment option under the Plan.  If IGT Stock were eliminated as an investment option under the Plan, this would have sent a negative signal to Wall Street analysts, which in turn would result in reduced demand for IGT Stock and a drop in the stock price.  Since the compensation of certain Defendants included IGT Stock, this sequence of events would reduce their compensation and also reduce their profits from selling IGT Stock.

164.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by (i) failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in IGT Stock and the

information provided to participants and beneficiaries concerning it; (ii) failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made IGT Stock an unsuitable investment for the Plan; (iii) failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; and (iv) by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in IGT Stock.

165.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries were damaged.

166.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

167.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

168.    This Count alleges co-fiduciary liability against the following Defendants: IGT and the Director Defendants (the "Co-Fiduciary Defendants").

169.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

170.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which s/he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

171.    Knowledge of a Breach and Failure to Remedy:  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it

has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  IGT and the Director Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

172.    IGT, through its officers and employees, engaged in inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to IGT as a matter of law.

173.    The Director Defendants, by virtue of their positions at IGT, participated in and/or knew about the Company's inappropriate business practices, and their consequences, including the artificial inflation of the value of IGT Stock.

174.    Because IGT and the Director Defendants knew of the Company's improper business practices, they also knew that the Committee Defendants were breaching their duties by continuing to invest the Plan's assets in IGT Stock when it was no longer prudent to do so, and providing incomplete and inaccurate information to the Plan's participants.  Yet, IGT and the Director Defendants failed to undertake any effort to remedy these breaches.

175.    Knowing Participation in a Breach:  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  IGT knowingly participated in the fiduciary breaches of the Committee Defendants in that it benefited from the sale or contribution of its stock at artificially inflated prices.  IGT also, as a de facto fiduciary, participated in all aspects of the fiduciary breaches of the other defendants.  Likewise, the Director Defendants knowingly participated in the breaches of the Committee Defendants because, as alleged above, they had actual knowledge of the Company's improper conduct and yet, ignoring their oversight responsibilities (as Directors), permitted the Committee to breach their duties.

176.    Enabling a Breach.  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary for failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1) in the

administration of their specific responsibilities that give rise to their status as a fiduciary, and s/he has enabled another fiduciary to commit a breach.

177.    IGT's and the Director Defendants' failure to monitor the Committee Defendants enabled those committees to breach their duties.

178.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, were damaged.

179.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

180.    Upon information and belief, the Plan suffered millions of dollars in losses in Plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in IGT Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

181.    Defendants are responsible for diminution in the Plan benefits caused by the Participants' direction of investment in IGT Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants provided inaccurate and incomplete information to the Plan Participants regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle.  As a consequence, Participants could not exercise independent control over their investments in IGT Stock, and Defendants remain liable under ERISA for losses caused by such investment.

182.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in IGT Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and ceasing investment in and/or divesting the Plan from its holdings of IGT Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

183.    Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiffs relied to their detriment on the misstatements and omissions that Defendants made to the Plan Participants.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

184.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in IGT Stock during the Class Period.  As a consequence of Defendants' breaches, the Plan suffered significant losses.

185.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

186.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

187.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting

from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

188.    Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a constructive trust on any amounts by which any defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in IGT Stock;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants

Dated:  October 2, 2009

  /s/ Matthew L. Sharp
Matthew L. Sharp, Esq.
Nevada Bar No. 4746
419 Flint St.
Reno, NV  89501
Telephone:  (775) 324-1500
Facsimile:  (775) 323-6249
E-mail: Matt@MattSharpLaw.com

Attorneys for Plaintiffs and the Class

49